## GWYNN v. GWYNN.

1. The constitution of this State (art. XIV., § 8) does not confer upon a
married woman, either expressly or impliedly, any general power to
contract, but simply implies the power to make such contracts as are
necessarily incident to the exercise of those powers that are conferred.
*Cases reviewed.*

2. The provision of the statute (*Gen. Stat.*, § 2036), that "all deeds,
mortgages, and legal instruments of whatever kind shall be executed
by her [a married woman] in the same manner and have the same
legal force and effect as if she were unmarried," confers no independ-
ent power to contract, but only prescribes the manner in which she
shall exercise such powers as are. elsewhere conferred upon her, and
their extent.

3. While a married woman had, under the act of 1870, a general and
unlimited power to contract, the amendment of 1882 (*Gen. Stat.;*

§ 2037) limited her power to contract at all, except "as to her separate property."

4. Therefore, under this law, a married woman could not enter into a contract of partnership with her husband or other person; for such a relation involves an obligation to contribute one's time and services, which a married woman has no right to control, and a personal liability for debts which she has no power to incur, as such debts would arise from partnership contracts which she has no power to make, they not being contracts as to her separate property.

5. This question being one of power and not of intention, no acts or representations made by the married woman, in the absence of fraud, would operate as an estoppel against her.

6. This case distinguished from *McLure* v. *Lancaster*, 24 *S. C.*, 273.

7. May a married woman, by virtue of the absolute dominion over her separate property with which she has been invested by the constitution, sell such property and apply the proceeds to the payment of her husband's debts?

8. A deed of assignment is not an absolute conveyance, but a conveyance in trust for the purposes therein declared, and where the objects of the trust fail, the title reverts to the assignor. A man and wife having signed articles of partnership, and afterwards executed a deed of assignment appropriating partnership assets to partnership debts, and separate property to individual debts, the assignment must stand only so far as it appropriated the so-called partnership assets (which were really the property of the husband) and the husband's individual property to his individual debts (including those of the so-called firm), and so far as it appropriated the wife's separate property to the payment of her legal obligations, which did not include the debts contracted by her husband in the firm name.

9. Recognition by the wife of the partnership and of her liability for its debts, declared in the deed of assignment, did not make valid a contract of partnership that she had no power to enter into, nor impose liabilities growing out of such illegal contract.

Mr. Justice McGowan, *dissenting*.

Before Fraser, J., Spartanburg, October, 1886.

The appeal was from the following decree :

Under section 2037, Gen. Stat., a married woman "may purchase any species of property in her own name * * * in the same manner as if she was unmarried." An unmarried woman may, under this law, purchase an interest in common, a joint interest, an interest in possession, remainder, or reversion. Why may not a married woman, under the terms of this act, do

the same ? Why may not a wife who can purchase as if unmarried, purchase jointly with her husband as well as his unmarried sister may do ? *Stew. Husb. & Wife*, § 308, *notes.* The right to purchase gives the right to purchase on a credit. *Ibid.*, § 223, *note* 6, citing authorities. She may purchase through an agent. *Ibid.*, *note* 28, citing authorities. I see no reason why the husband may not be that agent, and such an agent as is implied in all partnership.

I am of the opinion that a contract, express or implied, to pay a sum of money *in consideration* of the purchase of property by the person who makes the contract, is a contract in reference to that property so purchased and transferred, and that such property—a horse, a tract of land, a stock of goods, or a joint interest in a stock of goods—purchased by a married woman, is "her separate estate" in the sense used in the act. In the case of *Witsell* v. *Charleston* (7 *S. C.*, 100), it is said that the object of our statute (and in this respect the General Statutes of 1882 makes no change) was "to enlarge what was heretofore known as the wife's separate estate so as to embrace *all her acquisitions*, past or future, of such a nature that if she were a *feme sole*, they would vest in her as property."

It would be fair to infer that the words "in reference to her separate estate" were incorporated in section 2037, and used in this sense, and intended to cover all the property which an unmarried and therefore a married woman might hold, including interest held in common or jointly with others. In the case of *Haas* v. *Shaw* (91 *Ind.*, 384), it was held that under the statute of that State a married woman could not bind herself as a partner of a firm composed of her husband and herself. That statute differs from ours in several very important particulars. She cannot mortgage her property to pay her husband's debts. Her "sole and separate estate" seems to refer to property with which the husband must have no connection whatever, while under our act it seems to include all her estate of every kind which she could have held if unmarried. I am satisfied it is a fair construction of the Indiana statute to hold that a married woman cannot enter into a copartnership with her husband, so as to make herself liable for the debts.

In *Clinkscales* v. *Hall* (15 *S. C.*, 602), it was held that a mar-

ried woman, under the law as it then stood. might become surety for her husband, and there is nothing in words added by the amendment of 1882 in reference to her separate estate, which can in any way affect the question of her joint liability with him, raised in this case. If they can be jointly liable, they ought to be able to hold jointly. I conclude, therefore, that plaintiff did make a contract or contracts to pay their partnership debts, and that her interest in the firm was so intermingled with that of the defendant upon the successful management of the business of the firm, that the whole of the debts may be fairly said to have been made in reference to her "separate estate."

It may be admitted that this is not the correct conclusion, and that upon full consideration it may be held that she was not in law bound to pay the debts of the firm. Yet the assignment may be good. She had an unquestioned right to convey her estate to whom and for what purpose she pleased, with or without consideration, if done freely and voluntarily. If she was liable for these copartnership debts, then the deed is founded on a valuable consideration, and she has no right to complain. If she was not liable for them, and had a full knowledge of the facts, and executed the deed in consequence of a mistake, in ignorance of the law in reference to her liability, will that be sufficient to justify the court in setting aside the deed of assignment as void in consequence of this mistake in ignorance of law ?

The rule in principle suggested by Mr. Pomeroy in § 849 of his great work on Equity Jurisprudence, as the proper one to be applied in cases of mistakes of law, does not seem to be fully supported by the authorities. See note 1; to § 849. In *Cuningham* v. *Cuningham* (20 *S. C.*, 317), our Supreme Court holds that a mistake in the construction of a will was not sufficient ground on which to set aside a deed of conveyance made in consequence of that mistake—basing its conclusion on an opinion in one of our own cases as to the insufficiency of a mistake in the construction of a deed to authorize the court to set aside a conveyance. There is no good reason why any different rule should be applied where a person, instead of misconstruing a deed or a will, misconstrues a statute, which all persons, for the very peace of

society and stability of personal and property rights, must be presumed to know.

In the case before the court there was no fraud, no intentional misrepresentation, and all parties concerned, trustee, plaintiff and her husband, acted under the common impression that the married woman was liable for their contracts. It does not appear that she ever inquired, or ever was told, whether or not she was liable. If there was any error on this point, it was mere ignorance of law upon which these creditors themselves acted when they sold their goods to the firm of Gwynn & Co. If the court does grant the relief the plaintiff demands in this case in consequence of her mistake of law, it has no means of giving these creditors any relief for their mistake of law, in consequence of which these goods have been delivered to the plaintiff and her husband, and either used, mismanaged, or wasted by them.

In support of the view here taken as to the misconstruction of her liability under the statute by a married woman, I refer to *Herron* v. *Herron* (91 *Ind.*, 278), in which it was held that a mortgage given by a married woman to secure her husband's debts, could not be set aside because it was executed in consequence of the fact "that she was ignorant of the law and misinformed as to her legal rights." For these reasons I am not able to concur with the conclusions of the referee, conscious that the questions raised are new and interesting ones, about which there will necessarily be difference of opinions.

It is therefore ordered and adjudged, that the report be overruled and the complaint dismissed with costs.

Plaintiff appealed upon the following exceptions :

1. Because his honor erred as matter of law in reversing the report of the referee, David Johnson, Esq., and in holding that by the laws of South Carolina a married woman can lawfully enter into a contract of partnership with her husband.

2. Because his honor erred in reversing the judgment of the said referee that the deed purporting to be "a deed of assignment from A. J. Gwynn, M. L. Gwynn, and Gwynn & Co., to the defendants, C. P. Sanders, is inoperative, null, and void in so far as it affects the property of the plaintiff, Marie L. Gwynn."

3. Because his honor erred in not holding that if there were

no partnership, and therefore neither partnership property nor partnership assets nor partnership debts, that there was nothing which could uphold the deed as an assignment for purposes which did not in fact *exist*.

4. Because his honor erred in not adjudging (upon the facts as proved) that the plaintiff, Marie L. Gwynn, was not estopped, either by her conduct or by her deed, from asking the relief demanded in her complaint.

5. Because his honor erred in supposing that the mistake of the plaintiff (which mistake was not absolutely essential to the plaintiff's case) was a mistake of law, instead of being what it really was, a mistake of fact.

6. Because his honor erred in overlooking entirely in his decree, and not giving due weight to the position and condition of the said Marie L. Gwynn at the time of the execution of the said deed, and the representations that were made to her at and before the execution thereof.

*Messrs. Pope & Shand*, for appellant.

*Mr. J. S. R. Thomson*, contra.

November 29, 1887. The opinion of the court was delivered by

MR. JUSTICE McIVER. On August 18, 1884, the plaintiff and the defendant, A. J. Gwynn, then and yet being man and wife, with a view to the formation of a commercial partnership, signed a paper, of which the following is a copy:

"SPARTANBURG, S. C., Aug. 18, 1884.

"We, the undersigned, have this day formed a copartnership for the purpose of carrying on a general dry goods business under the style and firm of Gwynn & Co. A. J. Gwynn, of the undersigned, is hereby authorized to have entire management of said business, and to make all contracts, endorsements, &c.

"(Signed)                 M. L. GWYNN,
"A. J. GWYNN."

The business was carried on for a short time under the name of Gwynn & Co., but very soon proved so unsuccessful that it was deemed necessary to make an assignment for the benefit of

the creditors. Accordingly on March 3, 1885, a deed of assignment was executed by A. J. Gwynn and M. L. Gwynn (the same being also signed in the partnership name, Gwynn & Co.), whereby all the partnership assets, as well as the individual property of A. J. Gwynn, and the separate property of the plaintiff, were conveyed to the defendant, Sanders, in trust, that he should sell the same, and after paying all the expenses incident to the assignment, that the proceeds be applied to the payment of the partnership debts, and the individual debts of said A. J. Gwynn and M. L. Gwynn, so that the individual assets should be first applied to individual indebtedness and the residue thereof, together with the partnership assets, to such of the partnership debts as the holders thereof would receive in full discharge of their claims.

The assignee having accepted the trusts and entered upon the duty of carrying them out as declared by the deed of assignment, this action was commenced for the purpose of having the alleged partnership declared illegal, and not binding on the plaintiff, and for having the deed of assignment set aside, and cancelled, and for the purpose of procuring from the defendant, Sanders, an accounting for all the separate property of the plaintiff which went into his hands under the deed of assignment. The issues of law and fact were referred to a referee, who made his report, finding as matter of law that the agreement between the plaintiff and A. J. Gwynn, purporting to be a contract of partnership, was illegal and void, upon the ground that the plaintiff, being a married woman, had no power to make such a contract; and that the deed of assignment, so far as it purports to affect the separate property of the plaintiff, was likewise void.

Upon exceptions to this report, the Circuit Judge held that the contract of partnership was valid and binding upon the plaintiff; but that even if this be not so, still the deed of assignment was good and valid. And he therefore rendered judgment that the report of the referee be overruled, and that the complaint be dismissed. From this judgment the plaintiff appeals upon the several grounds set out in the record, whereby two general questions are presented for the consideration of this court: 1st. Whether the alleged contract of partnership is such a contract as

the plaintiff had the capacity to make. 2d. Whether the deed of assignment, in so far as it purports to affect the separate property of the plaintiff, is valid and binding upon the plaintiff.·

The first question involves an inquiry into the limitations upon the *power* of a married woman to make a contract, though, perhaps, it would be more accurate to say that it involves an inquiry into the extent to which a married woman has been invested with the power to contract. It is universally conceded that, at common law, she had no such power at all, and therefore any that she may now have must be derived solely from some constitutional provision or some statute. The only constitutional provision which we have upon the subject is that contained in section 8, art. XIV., of the Constitution of 1868, which reads as follows: "The real and personal property of a woman, held at the time of her marriage, or that she may thereafter acquire, either by gift, grant, inheritance, devise, or otherwise, shall not be subject to levy and sale for her husband's debts, but shall be held as her separate property, and may be bequeathed, devised, or alienated by her the same as if she were unmarried: Provided, that no gift or grant from the husband to the wife shall be detrimental to the just claims of his creditors."

Now, it is quite clear that this provision does not, *in express terms*, confer upon a married woman the power to make any contract at all; and the most that can be said is, that, *by implication*, it confers the power to make such contracts as are necessarily incident to the exercise of the powers expressly granted. For example, the power to alienate being conferred, this, by implication, carried with it the power to make a contract for the sale of her separate property. So the power to acquire property by grant or otherwise being recognized, the power to make a contract for the purchase of property would seem to be a necessary incident to such a power. But this is as far as the constitutional provision goes. It confers no general power to contract, either expressly or impliedly, but simply *implies* the power to make *such* contracts as are necessarily incident to the exercise of those powers which are conferred. This is so conclusively shown by the Chief Justice in the opinion prepared by him in the case of *Aultman & Taylor Company* v. *Rush* (26 *S. C.*, 517), that it

can scarcely be necessary to add anything to what is there so well said. But as a different view seems to be entertained by some whose opinions are entitled to the highest consideration, it may not be amiss to consider the subject further.

It is a mistake to suppose that the case of *Pelzer* v. *Campbell* (15 *S. C.*, 581), determined that the provisions of the constitution were broad enough to confer upon a married woman the general power to contract. On the contrary, the great question there was whether it was competent for the legislature to confer upon married women powers which had *not* been conferred by the constitution, and the court held that it was—that the provision of the constitution above quoted was not exhaustive of the subject, and that the legislature might confer additional powers upon a married woman to those mentioned in the constitution; and hence that the act of 1870, conferring upon a married woman the power to contract generally, was not unconstitutional. One of the reasons given for such a conclusion in that case was stated in the following language : "Based on the law, as it then stood, the main object of the provision in the constitution seems to have been, not so much to declare the rights of *the wife*, as to negative those of *the husband* in regard to her property, not to *enable her*, but to disable *him and his creditors*, and, therefore, no exhaustive catalogue of all her powers was intended to be given, but only a mention, in general terms, of such of them as were incident to the main purpose of excluding the rights of the husband." This language is followed by a quotation from the case of *Townsend* v. *Brown* (16 *S. C.*, 91), in which, speaking of this provision of the constitution, the following language occurs : "The real purpose there does not appear to have been to confer any new powers upon a married woman by changing her legal status, but simply to protect her property from liability for her husband's debts, and to release it even from the partial control of the husband by dispensing with the necessity which had previously existed of obtaining his consent and concurrence before her property could be disposed of."

In view of the construction thus authoritatively placed upon the provisions of the constitution, we do not see how it can now be contended that the constitution confers upon a married woman

the power to make any contract except such as is necessarily incident to the powers therein expressly granted. But again, as we are told by that eminent author, Judge Cooley: "Constitutions are to be construed in the light of the common law, and of the fact that its rules are still left in force. By this we do not mean that the common law is to control the constitution, or that the latter is to be warped and perverted in its meaning in order that no inroads, or as few as possible, may be made in the system of common law rules, but only that for its definitions we are to draw from that great fountain, and that, in judging what it means, we are to keep in mind that it is not the beginning of law for the State, but that it assumes the existence of a well-understood system, which is still to remain in force and be administered, but under such limitations and restrictions as that instrument imposes." Let us examine the constitutional provision which is here under consideration in the light of this principle.

At common law, as we have said, the civil existence of the wife being merged in that of her husband, her right to hold property separate from him was not recognized and she had no power to make any contract at all; but Courts of Equity did, for some purposes, recognize the individuality of the wife, as distinct from and independent of the husband, and especially did it recognize the right of the wife to possess and enjoy property separate from, and independent of, the control of her husband; and did recognize the power of the wife to exercise over such property all the powers authorized by the instrument creating such separate estate. But, however it may have been in England or elsewhere, it was the settled law of this State, "that where property is given or settled to the separate use of a married woman, she has no power to charge, encumber, or dispose of it, unless in so far as power to do so has been conferred on her by the instrument creating her estate, which power must be strictly pursued." *Reid* v. *Lamar*, 1 *Strob. Eq.*, 27. Accordingly, in that case, where, by an informal antenuptial marriage settlement, it was agreed that the wife should, through the intervention of a person designated as her agent, have "the full and free disposal" of all her property, together with "the sole direction and guidance thereof,"

it was held that the separate property of the wife was not liable for certain notes executed by her, together with her husband, some of which were for debts contracted on her account, upon the ground that the instrument creating the separate estate did not invest her with power to charge her estate in that way. But, on the other hand, where, as in *Clark* v. *Makenna* (*Cheves Eq.*, 163), the instrument creating the separate estate of the wife makes it "liable for her own debts and contracts," she may charge her estate by note or other contract, and her separate estate can be subjected to the payment of debts thus contracted.

This being the state of the law at the time of the adoption of the constitution, how are its provisions to be construed in the light of the previous well settled law? Is it not manifest that the constitution did nothing more than to declare *all* the property of a married woman to be "her separate property," as well that which she may have at the time of the marriage, as that which she may subsequently acquire, thus superseding the necessity for creating a separate estate in each particular case, by deed or will, and to invest her with power to dispose of the same either by bequest, devise, or alienation? It did not create any *new* estate, not previously known to the law, but simply declared that upon every marriage the wife's property should be held as her separate estate—an estate which was previously well recognized with all its incidents, but which, prior to the constitution, could only have been created by deed or will.

This being so, in considering the effect of the provisions of the constitution in any particular case, they should be construed just as if the same provisions were inserted in a deed, creating a separate estate in a married woman. Now, if the language used in the constitution had been incorporated in a marriage settlement, or other deed of trust, or in a will, it could not for a moment be contended that the wife was invested with any other powers than those specified in such deed or will; and if, as in *Reid* v. *Lamar*, *supra*, the power of "full and free disposal," of her property, together with the power to have "the sole direction and guidance thereof," did not confer upon the wife the power to bind her estate by contract, evidenced by a note executed by her, much less would the power to bequeath, devise, or alienate her separate

property, carry with it the power to bind her separate estate by contract.

It seems to us, therefore, that it is beyond dispute that the constitution confers no power upon a married woman to make any contract, except such as is necessarily incident to the powers expressly granted ; and beyond all question the power to enter into a contract of partnership is not incident to any power granted by the constitution.

Our next inquiry is whether there is any statute by which a wife is invested with the power to enter into such a contract of partnership as is here in question ; for a married woman confessedly having no such power at common law, and none such having been conferred by the constitution, it follows necessarily that those who claim the existence of such power must point out the statute by which it has been conferred. The only statutory provisions which we have upon the subject, applicable to the case now in hand, will be found in sections 2035, 2036, and 2037 of the General Statutes. The first of these sections being nothing more than a substantial repetition of the provisions of the constitution, need not be further noticed. Section 2036 reads as follows : "A married woman shall have power to bequeath, devise, or convey her separate property in the same manner, and to the same extent, as if she were unmarried ; and, dying intestate, her property shall descend in the same manner as the law provides for the descent of the property of husbands ; and all 'deeds, mortgages, and legal instruments of whatever kind shall be executed by her in the same manner, and have the same legal force and effect, as if she were unmarried."

Section 2037 is in the following language : "A married woman shall have the right to purchase any species of property in her own name, and to take proper legal conveyances therefor, and to contract and be contracted with as to her separate property in the same manner as if she were unmarried : provided, that the husband shall not be liable for the debts of the wife contracted prior to or after their marriage, except for her necessary support."

These sections were taken from the act of 1870 (14 *Stat.*, 325), but when they were incorporated in the General Statutes of 1882 a very important amendment was inserted in section 2037,

whereby the general power to contract, conferred by the act of 1870, was limited so that a married woman could only contract and be contracted with "*as to her separate property*"—the words italicized having been inserted as an amendment to the previous act, and one of the main inquiries in this case is as to the construction and effect of that amendment.

It may be, and has been, said that the language found in section 2036, declaring that "all deeds, mortgages, and legal instruments of whatever kind shall be executed by her in the same manner and have the same legal force and effect as if she were unmarried," confers upon a married woman the same general power to contract as is possessed by a *feme sole;* but, as is conclusively shown by the Chief Justice, in the case of *Aultman* v. *Rush,* hereinbefore referred to, this cannot be regarded as the effect of that language. To give it such an effect would be wholly to ignore the amendment of 1882, and would be in direct conflict with the decision of this court in *Habenicht* v. *Rawls* (24 *S. C.,* 461), where it was held that a married woman was not liable on a note executed by her, as surety for another, since 1882; for certainly a note is a "legal instrument." It is quite clear that the language relied on only prescribes *the manner* in which such powers as are otherwise conferred upon a married woman shall be exercised.

To determine the scope and effect of the amendment of 1882, it is important to bear in mind that prior to its adoption the act of 1870 had conferred upon a married woman general power "to contract and be contracted with in the same manner as if she were unmarried," and that, while there could be no dispute as to the effect of that language, there was serious controversy as to whether the legislature could, constitutionally, confer such unlimited power upon a married woman, which controversy was determined by the decision of this court in the case of *Pelzer* v. *Campbell, supra,* holding that the act of 1870 was constitutional. That decision was filed on November 16, 1881, and at the very next session of the legislature, held only a few days afterwards, the amendment under consideration was adopted and inserted in section 2037, as hereinbefore set out. This conclusively shows that the law making power was not satisfied that the law should

any longer remain as it was declared to be by the act of 1870, and, therefore, determined to make, and did make, a change in the law.

What was that change, and what was its purpose? As we have seen, under the previous law, the wife had general, unlimited power to contract; so much so as to enable her to bind her separate property for the payment of a note signed by her as surety for another. The change determined on was, manifestly, not for the purpose simply of avoiding that particular evil; for if that had been the object, it might have been effected by the insertion of a proviso to that effect, as has been done by some of our sister States. On the contrary, the change was broader and more radical. It was not confined simply to such a limitation of the general power to contract, as would forbid a married woman from contracting as surety for another—the particular kind of contract which, no doubt, prompted the desire for a change of the law—but it was such a limitation as would forbid her from making any contract, except a contract "as to her separate property." Its manifest purpose was to protect the wife by limiting her power to contract. The legislature, doubtless, had in view the object which the Court of Equity had in recognizing the separate estate of married women, which, as Chancellor Harper said, was to protect them "against the influence or practices of their husbands, which might be exercised without the possibility of detection; as also to guard them against their own generous or devoted impulses."

This could only be effected by depriving her of the *power* to contract, for if left to her own will, experience conclusively shows that a devoted and confiding wife could be very easily induced to sacrifice her all in, perhaps, what every one else would regard as a desperate attempt to shield a reckless or improvident husband from financial distress, and thus the law which was designed to afford her protection would be found totally inefficient to that end. If the purpose of the amendment was not to protect the wife, why should her *power* to contract, any more than that of a person *sui juris*, be limited at all? We are unable to conceive of any other reason. Hence, in considering the validity of a contract entered into by a married woman, the question is not as

to her *intention;* for if that were so, then the whole purpose of the amendment—the protection of the wife not only against the importunities, or perhaps the harsher influences of the ·husband, but also against her own generous and devoted impulses—would be defeated, but the sole question is whether the contract in question is of such a character as she has the *power* to make. But, it may be asked, if this be so, why then did not the legislature deprive a married woman of the power to make any contract at all, thus affording her complete protection ? The answer is obvious. The constitution having, by necessary implication at least, conferred upon a married woman the power to make a contract for the acquisition or disposal of her separate property, the legislature could not, of course, deprive her of such a power; but they could, and did, restrict the general power to contract previously conferred by the act of 1870, to a power to contract only "as to her separate property," following in the line of the constitution.

It may be said, if this be so, then the act goes no further than the constitution, and was, therefore, totally unnecessary. To this there are several answers. In the first place, section 2035, as we have said, is nothing but a repetition of the first part of the section of the constitution, very nearly *in totidem verbis,* and the slight change in the phraseology does not affect the meaning, and yet the legislature saw fit to re-enact this portion of the constitutional provision. In the next place, it will be observed that the word "contract" is not to be found in the constitutional provision, and hence the legislature might have deemed it advisable to confer, in express terms, a power which could only be implied from the provisions of the constitution. In the third place, and this we think is the proper view of the matter, the legislature finding that the constitution did not, in express terms, confer upon a married woman the power to contract and be contracted with, though such a power might be necessarily implied in the power to acquire and dispose of her property, and fearing that it might be doubtful whether the further power to make such contracts as would be necessary or desirable for the proper use, custody, preservation, and enjoyment of the wife's property, could also be implied from the general terms used in the constitution, made this enactment

for the purpose of removing such doubt by declaring, in express terms, that a married woman might "contract and be contracted with, as to her separate property, in the same manner as if she were unmarried."

This being the nature of the limited power of a married woman to make contracts, and the purpose of the limitation being to protect her not only from the importunities of her husband, but also from her own improvidence and weakness in yielding to her own generous and self-sacrificing impulses, we are now prepared to consider the first question presented in this particular case—whether the plaintiff had the power to make the contract of partnership set up in this case. It will be observed that the alleged contract, a copy of which is set out above, is expressed in the most general terms. It contains no provision that either of the proposed parties shall put in, as capital, any specified amount of money, or any particular property. It is simply a bald agreement between husband and wife for the formation of a general partnership, in which no particular terms are specified, and no provision that either or both of the proposed partners are to furnish the whole or any part of the capital. Now, we are told by Chancellor Kent (3 *Com.*, 2) that a "partnership is a contract of two or more persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss in certain proportions." And in 1 *Parsons on Contracts*, 147, it is said: "A partnership exists when two or more persons combine their property, labor, and skill, or one or more of them, in the transaction of business for their common profit."

Now, inasmuch as there is no mention made of any money, effects, or property in this agreement, if we should regard this as an agreement that each of the parties named should combine their labor and skill in the proposed enterprise, it is quite certain that no such partnership could be formed between husband and wife, for the simple reason that her labor and skill already belong to her husband. As we have determined in the recent case of *Bridger* v. *Howell* (*ante*, 425), neither the constitution nor the statutes have made any change in the doctrine of the common law that the husband is entitled to the personal earnings of the wife,

because her services belong to him and not to her. But if, on the other hand, the alleged contract of partnership could be regarded as an agreement on the part of the wife to put her separate property into the partnership as a part of its capital, the very moment it was so put in, it would at once cease to be her *separate* property and would become the property of the partnership, and hence any contract subsequently made by the alleged partnership could not be regarded as a contract made by the wife "as to her separate property"—the only kind of contract which she has the capacity to make—and she could not, therefore, be bound thereby. A married woman being thus denied the capacity to assume one of the liabilities necessarily incident to the partnership relation, it would seem to follow necessarily that she has no power to form such a relation.

But even if it should be assumed that an agreement by a married woman to put her separate property into a partnership as a part of its capital, was a contract as to her separate property, it would be quite sufficient, for the decision of this particular case, to say that the contract here set up contains no such stipulation or provision. We are not, however, disposed to rest our decision upon that narrow ground. Even conceding that an agreement by a married woman to contribute her separate property to the capital of a partnership, *if that was all of the agreement*, would be such a contract as she was competent to make, would not conclude the inquiry, for that is *not* all that is involved in the contract of partnership. It most usually involves an obligation to contribute one's time and services, which a married woman has no right to control, and, what is much more important, it involves a personal liability for the debts of the partnership, which a married woman has no power to incur, as such debts arise from contracts, which can in no sense be regarded as contracts as to her separate property. It seems to us clear, therefore, that, even looking to the property relations between husband and wife, a contract of partnership is not such a contract as a married woman has been invested with the power to make; but when we look to the more important and sacred relations between man and wife, which lie at the very foundations of civilized society, which are liable to be at least disturbed, if not absolutely destroyed, by

allowing the wife to enter into partnership with any one, with whom she may see fit to form such a relation, we cannot suppose that the legislature ever intended to invest her with such a power. They certainly have not said so in express terms, and we do not think that such a power can be implied from what they have said.

If, then, the plaintiff had no power to enter into the alleged contract of partnership, it follows necessarily that there could be no partnership debts, and that neither the plaintiff personally nor her separate property can be held liable for the so-called partnership debts. It does not seem to us that there is any room for any estoppel. As we have seen, the question is one of *power*, not of *intention*, and in the absence of any allegation and proof of fraud, we do not see how any representations, either by word or act, could affect the inquiry. There was, no doubt, an honest mistake on the part of all parties concerned. The creditors all knew or had a very ready means of ascertaining that the plaintiff was a married woman. There was no pretence of any concealment or misrepresentation as to that. Indeed, we think the evidence shows that the creditors knew that they were dealing with a partnership, so-called, which purported to be composed of husband and wife, and the mistake which they, as well as the plaintiff, made was in supposing that the plaintiff had the capacity to enter into such a contract. If the plaintiff had no *power*, even by an agreement in express terms, to bind herself or her separate property for the payment of the so-called partnership debts, certainly no acts or representations made by her, in the absence of actual fraud, could have the effect of estopping her from denying a liability which she had no power to incur.

The case of *McLure* v. *Lancaster* (24 *S. C.*, 273), which seems to be much relied on by counsel for respondent, as showing that it was competent for the wife to enter into any business transactions with her husband, and hence that she might enter into partnership, differs very materially from the present case, and is very far from warranting any such conclusion. In that case the wife had conveyed her separate property to her husband, reserving to herself the use and enjoyment of the rents and profits during her life, the property to revert to her in case she survived her

husband. Upon the death of the husband, leaving the wife surviving, she brought the action against his executors to recover the rents and profits received by him during his life, and the jury were instructed, properly, as it was held, that the real question was, whether the wife had permitted the husband to receive the rents and profits and dispose of the same as he pleased; for if so, then a gift of the rents and profits from the wife to the husband might be implied. This necessarily resulted from the power conferred upon a married woman by the constitution to dispose of her separate property, which, of course, would include the rents and profits thereof, and that having the power, by express gift, to transfer the rents and profits to the husband, such a gift could very well be implied from her long acquiescence in the receipt and uncontrolled disposal of them by the husband. The language used by the Chief Justice, in delivering the opinion, shows conclusively that this right of the wife to make contracts with her husband, or as it is there expressed, enter into "business transactions" with him, was confined to contracts or transactions with reference to the wife's *separate property*, and did not extend to contracts or transactions generally, for after stating the ruling of the Circuit Judge, the Chief Justice said (italics ours): "When the judge *confined* such transactions to *the property* of the wife, it cannot be said that he went too far."

If, then, the plaintiff was not liable for the so-called partnership debts, the only remaining inquiry is, whether the deed of assignment, in so far as it affected the separate property of the plaintiff, was valid and binding. Even conceding that, by virtue of the absolute dominion over her separate property with which a married woman has been invested by the constitution, she might sell such property and apply the proceeds to the payment of the debts of her husband, although the manifest object of the constitutional provision was to protect her property against such debts, yet the question would still remain, whether this deed of assignment was a valid appropriation of the property of the plaintiff to the payment of her husband's debts. A deed of assignment is not an absolute conveyance, but it is a conveyance *in trust* for the purposes therein declared, and if the object of the trust fails,

there is no valid conveyance of the property embraced in the deed, or at least the title reverts to the grantor.

In *Hill on Trustees*, 342, we are told, upon the authority of the cases there cited, that "in expounding trusts, though created by deed, the intention of the parties is to be pursued, as much as in cases of wills." We must therefore inquire what was the intention of the plaintiff in executing the deed of assignment, as derived from its terms. It certainly was *not* her intention to appropriate her separate property, or any part thereof, to the payment of her husband's debts, as appears clearly from the terms of the deed. It appears from the several schedules attached to, and forming a part of, the deed, that the plaintiff had separate property and was owing individual debts; that her husband also had individual property and was owing individual debts; and that there were debts as well as assets of the so-called partnership under the name and style of Gwynn & Co.

This being the condition of things, the next inquiry is, what were the purposes of the deed—what were the intentions of the parties as disclosed by its terms? The deed, after stating the contracting parties, commences with a recital that the parties of the first part, the plaintiff and her husband, are indebted to divers persons, and being then unable to pay the same in full, and being desirous to provide for the payment of the same by an assignment of all their property, then proceeds to convey the same to the defendant, Sanders, in trust for the purposes therein declared, which in brief are as follows: 1st. That the individual property of each shall be applied to the payment of their individual debts, and any surplus that may remain after such application shall be applied to the payment of "all the creditors of the said A. J. Gwynn and M. L. Gwynn as partners." 2nd. That the partnership assets shall be applied to the payment of the partnership debts.

These purposes, as thus disclosed by the terms of the deed, show clearly that it was the intention of the parties that the separate property of the plaintiff should be applied first to the payment of her own individual debts, and next to the payment of such creditors of the supposed partnership, as should be able to establish their demands before him, and that no part of her sep-

arate property was to be applied to the individual debts of her husband. Now, if, as we have seen, there was no partnership, there could, of course, be no copartnership creditors, and therefore so much of the deed as purported to appropriate the separate property of the plaintiff to the payment of debts of Gwynn & Co., which must be regarded as nothing more than the individual debts of A. J. Gwynn, contracted by him under the name and style of Gwynn & Co., could not take effect by reason of the non-existence of the declared object of such appropriation.

The fact that the plaintiff has, by the terms of the deed of assignment, recognized the existence of the partnership and her liability as partner, cannot affect the question. For, as we have seen, the question is one of *power*, and not of *intention ;* and if she had no power to enter into the contract of partnership by an express agreement to that effect, certainly her subsequent recognition of it could not make it valid. So, too, not having the power to make any contract except as to her separate property, she could not, even by express admission, assume liability for a debt contracted by her husband in the name of a partnership of which she was erroneously supposed to be a member, as that was not such a contract as she was authorized to make.

It seems to us, therefore, that the deed of assignment, in so far as it purports to appropriate any portion of the separate property of the plaintiff to the payment of any debts contracted by her husband under the name of Gwynn & Co., should have been adjudged a nullity and not binding on the plaintiff ; but that it may stand in so far as it purports to appropriate her property to the payment of such individual debts as may be shown to be legally due by her, as well as in so far as it appropriates the individual property of A. J. Gwynn to the payment of his individual debts.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and that the case be remanded to that court for such further proceedings as may be necessary to carry out the views herein announced.

MR. CHIEF JUSTICE SIMPSON concurred.

MR. JUSTICE MCGOWAN, *dissenting.* I cannot concur in this

opinion so far as it relates to the partnership debts, and the assignment of Mrs. Gwynn to pay them. With great respect for the opinion of my brethren, I find it impossible to agree with the construction given to the married woman's provision in the constitution, and to the act of 1870 as amended in 1882, giving to a married woman the power to contract as to her separate estate. The provision of the constitution is in these words: "The real and personal property of a woman, held at the time of her marriage, or that she may thereafter acquire, shall not be subject to levy and sale for her husband's debts, but shall be held as her separate property, and *may be bequeathed, devised, or alienated, the same as if she were unmarried,*" &c. In construing this provision, it is insisted that the word "alienated" does not, either expressly or impliedly, confer upon a married woman any power of disposition over her separate estate, except to make "a simple sale of it" out and out; for the reason, as claimed, that the provision must be construed in the light of the common law, which denied to a married woman any power to contract or dispose of her property. As it seems to me, such a construction is unauthorized for the following, among other, reasons, stated in simple propositions:

First. The very nature of the instrument in which the provision appears, as it seems to me, excludes such construction. It is a formal provision in the constitution, embodying the fundamental law, which, as is very apparent, essayed to make very radical changes upon the very subject of the status of a married woman concerning her separate property. The common law may be repealed by a simple act of the legislature, not to say by the constitution, the fundamental law. If it were otherwise, the old common law could never be changed at all, which is certainly not the case. If it had not been the intention to alter the common law, why was the provision inserted at all? In the citation from Judge Cooley, he says: "We do not mean that the common law is to control the constitution, or that the latter is to be warped and perverted in its meaning in order that no inroads, &c., may be made in the system of common law rules, but only that for its *definitions* we are to draw from that great fountain," &c. That is certainly sound doctrine, but I have never been

able to see wherein the common law has ever undertaken to *define* the word "alienate," so as to limit it to a straight out and out "sale" under any and all circumstances.

Second. The proposed construction is absolutely negatived by the context of the provision. It cannot be denied that the other words in the connection, "bequeath" and "devise," confer substantial and important additional powers upon a married woman, which, before the constitution, were not allowed by the common law ; yet no one has ever claimed that they were not entitled to their proper and natural meaning. As to them, and that other great power of holding property in her own name without the intervention of a trustee, we hear nothing of the alleged necessity of reading them in the light of the common law. On the contrary, it is perfectly manifest that it was the intention of those who framed the constitution *to change the common law*, and to repeal so much of it as was inconsistent with the terms used—construed in their natural and proper sense. The meaning of the word "alienate" is quite as clear and well defined as that of "devise," and if the common law is not invoked as to one, why should it be allowed to limit and emasculate the other in palpable violation of the words used, and, as I believe, of the whole scope and intention of the instrument itself? There cannot be the least doubt as to the intention of the married woman provision, as ascertained by the words used, as well as by contemporanous construction and the acts of the legislature passed soon after the adoption of the constitution to carry into effect its provisions.

Third. The construction proposed is contrary to the clear meaning of the word itself. Instruments are generally construed to mean what the words used naturally import. "Alienate" is a general term, covering and embracing all the different modes by which property may be legally transferred. This is not only its natural and proper, but its necessary, meaning in the connection in which it appears, in order to make the whole provision consistent and harmonious in all its parts, particularly in reference to the words which follow, "by her the same if she were unmarried," &c.

Fourth. The proposed construction is contrary even to the equity doctrines, which were administered by the old Court of

Chancery before the constitution was adopted, and when a married woman had *no power* to contract, except in so far as it was given in the instrument creating her separate estate. As, for example, in the case of *Porcher* v. *Daniel*, 12 *Rich. Eq.*, 347 (as late as 1866), it was held that "where property of the wife is, by marriage settlement, surrendered to her 'full and free disposal'—she to have 'the sole direction guidance thereof'—she has the power, during coverture, to dispose of the same absolutely by will." In delivering the judgment of the court, Chancellor Inglis expressed what I think was the law *then*, and much more certainly what the law is *now*. "A married woman, having a separate estate, and having also a general and absolute power of disposition over it, may charge or alienate it, or any part of it, or, partially or wholly, temporarily or permanently, divest herself of her interest in it, or in any part of it, in any of the modes in which the same kind of property or things may be legally charged or alienated, &c., by one who is *sui juris;* only her intention to do this must be clearly manifested," &c. It seems to me that the unrestricted power "to alienate," is quite as comprehensive and absolute as that given by the words "full and free disposal" ; and that if the constitution had never been adopted, but the power to "alienate" had been given in a deed *inter partes*, creating the separate estate of Mrs. Gwynn, it would have carried the power to use the same and to dispose of it in the manner and according to any of the different modes indicated by Chancellor Inglis. The highest court in the State, as late as 1866, said that was the law then ; and it would certainly be surprising if the provisions of the constitution, which we all know were intended to enlarge the powers of a married woman over her separate estate, should be so construed as actually to diminish those powers ! !

Fifth. I have already in the case of *Aultman & Taylor Co.* v. *Rush* indicated my view of the proper construction of the act of 1870, amended in 1882, so as to give to a married woman the express power to contract as to her separate estate, and I need not repeat it here.

I think the decree below should be affirmed.

Judgment reversed.